# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-499


**ST. MARTIN PARISH GOVERNMENT**

**VERSUS**

**BRYAN CHAMPAGNE, ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 83926
HONORABLE KEITH R.J. COMEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Elizabeth A. Pickett, John E. Conery, Van H. Kyzar, and Candyce G. Perret, Judges.


Conery, J., dissents and assigns reasons.
Kyzar, J., dissents for the reasons assigned by Judge Conery.


**MOTIONS TO DISMISS DENIED; EXCEPTION OF NO RIGHT OF ACTION DENIED; JUDGMENT AFFIRMED.**

**Allan L. Durand**
**235 La Rue France**
**Lafayette, LA   70508**
**(337) 237-8501**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **St. Martin Parish Government**

**Gregory J. Logan**
**The Logan Law Firm**
**Post Office Box 52704**
**Lafayette, LA   70505**
**(337) 406-9685**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Bryan Champagne**
     **Champagne's  Cajun Swamp Tours, LLC**
     **The Wharf on Lake Martin, LLC**

**Michael O. Adley**
**Gibson Law Partners, LLC**
**Post Office Box 52124**
**Lafayette, LA   70505**
**(337) 761-6023**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Bryan Champagne**
     **Champagne's Cajun Swamp Tours, LLC**
     **The Wharf on Lake Martin, LLC**

**PERRET, Judge.**

St. Martin Parish Government ("Appellant") appeals the dismissal of its Petition for Injunctive Relief, with prejudice, in which it sought an injunction against The Wharf on Lake Martin, LLC; Champagne's Cajun Swamp Tours, LLC; and Bryan Champagne (collectively referred to as "Appellees") to: (1) prohibit commercial and/or retail ventures and activity at 1076 Rookery Road, Breaux Bridge, Louisiana, in violation of the W-2 zoning district, and (2) to remove all structures at that location which infringe on the set-back restrictions set forth in the parish zoning ordinance. Additionally, the trial court dismissed as moot Appellees' reconventional demand for damages if Appellant was successful in obtaining an injunction. The trial court assessed costs of the proceedings to St. Martin Parish Government, but failed to specify the exact amount of court costs in accordance with the requirement of La.R.S. 13:5112. On appeal, Appellees have also filed two motions and incorporated memoranda to dismiss appeal for lack of jurisdiction and an Exception of No Right and Incorporated Memorandum. We deny Appellees' motions to dismiss appeal as well as the exception of no right and affirm the trial court's judgment.

**FACTS AND PROCEDURAL HISTORY:**

On April 29, 2016, Appellant filed a Petition for Injunctive Relief asserting that Appellees were in violation of the parish zoning ordinance. Specifically, that Appellees' premises are located within a W-2 zoning designation, which does not permit commercial activity. Appellant asserted that Appellees' commercial ventures include the sale of food and drinks, marketing of fishing paraphernalia, kayak and canoe rentals, and paid boat tours. Furthermore, Appellant's petition asserts that Appellees' buildings violate the set-back mandates of the parish zoning ordinance.

Appellees filed an answer asserting that all building and activity was conducted after obtaining the necessary parish permits and raised the defenses of estoppel and Appellees' vested rights and reliance on the permits. Additionally, Appellees filed an Amended and Restated Answer to Petition for Injunctive Relief and Reconventional Demand on August 31, 2018, which additionally alleged that the zoning ordinance was vague, ambiguous, and unconstitutional and also sought damages in the event that Appellant succeeded in obtaining the requested injunction. Regarding the ordinance, Appellees assert that the ordinance was "unconstitutional as it was haphazardly thrown together, is vague and ambiguous and incomplete insofar as referenced map, policies and procedures outlined in the Ordinance were never followed or performed." Furthermore, Appellees assert that the police jury failed to support the enactment of the ordinance with a vote of the people or an act of the legislature.

A trial on the merits was held on April 8, 2019. At trial, the parties stipulated to the following facts:

1. On May 23, 2011, St. Martin Parish Government issued Commercial Building Permit number 006816-01 to Bryan Champagne for the construction of a wood frame building with a designated Construction Type as "Bait Shop" and Proposed Use as a "Grocery Store", at an address of 1076 Rookery Rd. 8 [sic], St. Martinville.

2. On April 22, 2013, St. Martin Parish Government issued Commercial Building Permit number 010667-02 to The Warf [sic] on Lake Martin for the construction of a wood frame construction with a designated Construction Type as "Deck" and Proposed Use as "Commercial", at an address of 1076 Rookery Rd., St. Martinville.

3. On April 22, 2013, St. Martin Parish Government issued Commercial Building Permit number 010778-01 to The Wark(sic) on Lake Martin for the construction of a wood frame construction with a designated Construction Type as "Commercial" and Proposed Use as "Roof Over Deck", at an address of 1076 Rookery Rd., St. Martinville.

4.     Pursuant to these permits, Bryan Champagne constructed a building and wharf on the banks of Lake Martin from which he operates boats in a tour guide business conducted in Lake Martin, as well as selling food, drinks, bait, and other miscellaneous items from the buildings constructed pursuant to the permit.

5.     On June 28, 2011, Champagne received a President of Parish Government Clearance in connection with a liquor/beer permit issued to his business.

6.     On June 22, 2011, Champagne received a Planning & Zoning Clearance in connection with a liquor/beer permit issued to his business.

7.     On June 21, 2011, Champagne received a Health Unit Clearance in connection with a liquor/beer permit issued to his business.

8.     Bryan Champagne and/or The Wharf on Lake Martin have continuously since 2011 operated a commercial tour guide service, as well as selling food, drinks, bait, and other miscellaneous items, from the building and wharf constructed pursuant to the permits referred to above.

Additionally, the evidence submitted at trial included: the zoning ordinance with appendices, building permits, inspections, a March 3, 2016 cease and desist letter, St. Martin Parish E-911 Commission evidencing that Appellees secured an address, certification of occupancy, liquor/beer permit, the deposition of Guy Cormier (prior Parish President), and Appellant's responses to discovery. Further testifying at trial were Chester Cedars, current parish president and prior parish counsel; Becky Patin, St. Martin Parish Clerk of Court; Bryan Champagne; and Shani Dodge, who worked in the parish building permits section.

The trial testimony and evidence showed that Bryan Champagne went to the parish and obtained all permits and inspections the parish required of him prior to starting business at 1076 Rookery Lane, which he leased. Although Mr. Cedars testified that Appellees' business is located at 1075 Rookery Road, differing from the permits, Mr. Champagne testified that the address was provided to him by 911

3

and at no time was he informed that he had the wrong address. When Mr. Champagne wished to add additional structures in 2013, he again obtained all permits required by the parish. Additionally, prior to obtaining the 2013 permits, Mr. Champagne testified that Mr. Cormier and Jacques Miguez, the Planning and Zoning Coordinator, came out to Appellees' premises before approving the permits.

Chester Cedars testified that he believes the permits were the result of an administrative error. Mr. Cedars also explained that his understanding of the ordinance is that, unless stated otherwise, zoning designations set forth in the ordinance apply to both sides of the road and that a W-2 designation does not permit an exception to the zoning designation.

As for the zoning ordinance at issue, signed on August 26, 1996, the ordinance divides St. Martin Parish into sixteen types of districts, with W-2 referring to "Woodland/Flood Plain – recreation/residential district." The zoning ordinance states:

> [Article III] Sec. 2. Zoning district map (defined)
>
> The boundaries of the said districts are as defined in the Zoning District Identification File (Public Road Zoning Data File) which has been properly attested and placed on file in the office of the St. Martin Parish Clerk of Court. This Zoning District Identification File, together with all maps, notations, references, and other information thereon, is made part of this ordinance and has the same force and effect as if fully set forth or described herein.
>
> Sec. 3. Interpretation of district boundaries
>
> Where uncertainty exists with respect to the boundaries of any of the aforesaid districts as described, the following rules shall apply:
>
> (a) Where district boundaries are indicated as following streets, highways, or alleys, the center line of such streets, highways, or alleys shall be construed to such boundaries.
>
> (b) Where the land has been or may hereafter be divided into blocks and lots and where district boundaries are so indicated that they

4

approximately follow the lot lines, such lot lines shall be construed to be said boundaries.

(c)  In unsubdivided property, the district boundary lines on the zoning district map shall be determined by the use of the scale appearing on the map.

. . . .

Sec. 4. Regulation of areas under water

All areas which are under water and not shown as included within any district, shall be subject to all of the regulations of Woodland/Flood Zone areas.

. . . .

[Article IV] Sec. 1. Use of building or land

Except as hereinafter provided, no building or land shall hereafter be used or occupied and no building or part thereof shall be erected, moved, or altered unless in conformity with the regulations herein specified for the district in which it is located.

. . . .

[Article IX] Sec. 3. Function of Director of Planning and Development

The Director of Planning and Development shall issue development permits which are in accord with the provisions of this ordinance, review plans for construction and installation of signs, **issue certificates of zoning compliance at the same time as he issues the development permit providing the building or structure meets the requirements of this ordinance**, be responsible for the enforcement of the ordinance, conduct inspections of construction to ensure that it complies with the provisions of the ordinance, and **maintain a set of up-to-date zoning maps and zoning texts**.

. . . .

Sec. 7. Development permits

No building or structure shall be erected, altered, repaired, or relocated until a permit therefore has been issued by the Director of Planning and Development.  The application for and issuance of such permits shall be in accordance with the requirements of the development code, except that **no permit shall be issued until application for a certificate of zoning compliance has been made and approved**.

Sec. 8. Certificate of zoning compliance

No change in the use or occupancy of land or of an existing building shall be made, nor shall any new building be used or changed in use until a certificate of zoning compliance shall have been issued by the Director of Planning and Development **stating that the proposed use of the building or land complies with the provisions of this ordinance.** Applications for a certificate of zoning compliance shall be made coincident with the application for a development permit. **After determining that the proposed erection, alteration, repair, relocation, or change in use is in compliance with the provisions of this chapter, each such application shall be approved by the Director of Planning and Development.**

(Emphasis ours).

Attached to the zoning ordinance is Appendix A, Schedule of Zoning District Regulations Land Use/Zoning Definitions; Appendix B, Land Use Suitability Survey; and Appendix C, Parish Road/Land Use Suitability Listing. Appendix A states that "[a]ll areas within a designated flood plain or flood zone are zoned as 'Woodland / Flood Plain' lands and must comply with the appropriate federal, state, or parish regulatory uses[.]" The permitted uses of a W-2 district include: "Those uses allowed in zoning districts W-1 . . . and R-2 . . .; Public and private camp sites; temporary commercial amusement or recreational developments." Additionally, the lot requirements require a front yard of twenty feet. The permitted uses of a W-1 district include: "Wildlife refuge; public/private recreational boating, camping, fishing, hiking, hunting, nature study, etc. area, oil and gas extraction, storage, and transfer facilities; public and private boat launch ramps, temporary structures and uses as authorized by custodial authority/owner." Lastly, R-2 districts permit: "Single family dwellings . . . parish parks and playgrounds and facilities in conjunction therewith; libraries; museums; churches; public schools; private

schools . . . private recreational uses; private gardens; private nurseries; private garages; home occupations . . . duplexes . . . and mobile home subdivisions[.]"

Appendix C contains a list of streets in the parish and the zoning designation of each road. Specifically, Appendix C states, "The zoning designation (LNDUSE) collum (sic) indicates the predominate land use allowed along and adjacent to all public roads in St. Martin Parish. Detailed zoning classifications are as indicated in 'Appendix D.' (Parish Road Zoning Data Sheets) of this ordinance." Appendix C lists Rookery Road as "W-2." There is no "Appendix D" attached in the record.

At trial, Becky Patin, St Martin Parish Clerk of Court, testified that a plat with the zoning districts was not on file with the clerk of court until April 4, 2019. Additionally, despite the ordinance referencing a certificate of zoning compliance, Appellant's discovery responses indicate that the parish does not use a document known as a "Certificate of Zoning Compliance." This court notes that the parties stipulated that Appellees received a President of Parish Government Clearance on June 28, 2011, and a Planning & Zoning Clearance on June 22, 2011 in connection with a liquor/beer permit issued.

At trial, Appellant's counsel conceded, despite seeking the removal of any structures which violate the front yard set-back requirements in its petition, that the parish cannot make Mr. Champagne move his building because the parish issued the permits. Counsel argued instead that "[t]he only question that we're putting to the Court is even though we did that in error and we can't make him move his buildings, is he allowed to continue to conduct a commercial activity in an area that it's not zoned for?"

After providing oral reasons for ruling at trial, the trial court signed a judgment on April 18, 2019, dismissing Appellant's Petition for Injunctive Relief and finding Appellees' reconventional demand moot.

Appellant now appeals and presents four issues for review:

ISSUE #1: Did the SMPG [St. Martin Parish Government] Zoning Ordinance prohibit commercial activity in the area in which Champagne's business was located?

ISSUE #2: Were the permits issued improperly because of the prohibition of commercial activity in zone W-2?

ISSUE #3: Was SMPG arbitrary in attempting to enforce its zoning ordinance in this case?

ISSUE #4: Does the "vested right" doctrine apply in a case in which the issuing authority (SMPG) did not act arbitrarily?

Additionally, Appellees filed a Motion and Incorporated Memorandum to Dismiss Appeal for Lack of Jurisdiction, which was referred to this court on the merits.

**MOTIONS TO DISMISS:**

In both their first and second motions to dismiss, Appellees argue that Appellant only appeals one of the grounds for the trial court's ruling on appeal—the vested rights issue. However, Appellees assert that the trial court also found the ordinance is vague and unconstitutional. Thus, because the unconstitutional issue was not appealed, a reversal by this court on the vested rights issue would not change the outcome of the trial court due to the zoning ordinance being ineffective and, therefore, there is no practical relief that this court can grant Appellant. Citing to *Felder v. Political Firm, L.L.C.*, 14-1266 (La.App. 1 Cir. 4/24/15), 170 So.3d 1022, Appellees conclude that the appeal should be dismissed for lack of subject matter jurisdiction.

The issue of the zoning ordinance being vague and unconstitutional was raised as a defense in Appellees' answer and also in Appellees' amended answer and reconventional demand. Appellees assert that the trial court agreed with Appellees that the zoning ordinance was vague and ambiguous, and, therefore, unenforceable.

However, it is Appellant's position that the judgment "contains no decretal language declaring the SMPG zoning ordinance to be invalid or void," and that the trial court only based its ruling on the vested rights argument. Furthermore, Appellant argues that Appellees' attack on the zoning ordinance's validity via an answer to a petition for injunction is an unauthorized collateral attack on the ordinance.

The trial court's judgment does not indicate what grounds were used in entering judgment in favor of Appellees and dismissing Appellant's injunction. Instead, the judgment merely states:

> Considering the evidence presented and for the reasons orally assigned, the Court enters Judgement in favor of Bryan Champagne, The Wharf on Lake Martin, LLC and Champagne's Cajun Swamp Tours, LLC, dismissing the St. Martin Parish Government's Petition for Injunction, with prejudice. Furthermore, the Reconventional Demand of Appellees is now moot and; therefore, hereby dismissed.

After summarizing the facts of this case as it understood them, the trial court provided the following oral reasons for ruling:

> The defendants have raised two exceptions to the zoning. Those are the vested rights and the zoning ordinance being void and ineffectual due to problems with the recordation and the adoption or notice provisions under the zoning ordinance. The Court finds that both are applicable. The Court finds that the estoppel and vested rights that Mr. Champagne obtained by obtaining the proper permit that he feels was needed and requested and the giving of those permits in effect granted him a right to the occupancy of that land. He had no knowledge, as he testified to, what he had to do in order to get the permit. The parish government is under a duty to know the ordinances and know what the regulations are. Had they told Mr. Champagne at that particular time that he could not get a permit, certainly he would have

9

either taken legal action or accepted it as it was. But he got the permit. And now to come in five years later and say, no—not actually five years later, eight years later, but the suit's been going on for three years—say no, we're going to shut you down because we made a mistake, there's a certain operation in the law, detrimental reliance or estoppel. Certainly Mr. Champagne has invested hard-earned money into his business. He's done what the parish has asked him to do as far as permitting and operations. He has not violated any laws other than the zoning ordinance, which the Parish condoned, initially. So, therefore, the Court finds that the vested rights interests apply in this particular case.

Mr. Durand did, in fact, point out that the cases cited by the plaintiff were not cases of commercial litigation but were for residential or a rental type litigation. I think there was one case cited by Mr. Durand that involved a hotel with the operation or building or a restaurant in the hotel and it didn't comply with the zoning order. But, as Mr. Adley adequately pointed out, that was done at the behest at the beginning of the construction before significant time and effort had been placed into the construction and the place being under operation. In this case, we're eight years down the road, where Mr. Champagne has been operating his business to make it a successful business. The parish government, in this particular case, is not coming in and trying to shut it down because it made it [sic] a mistake, not Mr. Champagne. So the Court finds that that vested rights interest, even though it's not been litigated in a commercial setting of this type, the Court finds that it would be extended to this type of setting and finds that Mr. Champagne's rights would be violated if the injunction would be enforced to shut him down.

The second thing though, also, that the Court finds is that the zoning ordinance in this particular case is poor, at best. The map filed of record that the Court has reviewed is a road map of the parish government. It has no zones. It has no margins outside the roads to connect the various zoning districts or zoning parts. Additionally, the fact that Mr. Champagne applied at 1075 or 1076 Rookery Road is of no consequence. Both of them are in the W-2 zone, so it would have no bearing in this particular case.

I've been brought no evidence, other than Mr. Cedar's esteemed opinion, that the constitution of Louisiana has been violated. I've been pointed to no law to say that the constitution of Louisiana has been violated in this case. And the last thing is the zoning map was not filed of record in the Clerk of Court's Office until April 4th of 2019, some eight years after Mr. Champagne obtained his first permit.

So therefore, based on these findings, the Court will deny the St. Martin Parish Government's request for an injunction. Costs will be paid by St. Martin Parish Government.

"A final appealable judgment must contain decretal language, and it must name the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or denied." *Brooks v. Sibille*, 12-1093, 12-1094, pp. 2-3 (La.App. 3 Cir. 1/30/13), 107 So.3d 826, 828 (quoting *Gaten v. Tangipahoa Par. Sch. Sys.*, 11-1133, p. 3 (La.App 1 Cir. 3/23/12), 91 So.3d 1073, 1074). Additionally, "[t]he relief granted or denied must be determinable from the judgment itself without reference to an extrinsic source such as pleadings or reasons for judgment." *Commodore v. City of New Orleans*, 19-127, p. 6 (La.App. 4 Cir. 6/20/19), 275 So.3d 457, 463. *See also Brooks*, 107 So.3d 826.

An "ordinance remains valid until such time as it is judicially overturned." *Priola v. Calcasieu Par. Police Jury*, 97-161, p. 5 (La.App. 3 Cir. 6/4/97), 696 So.2d 183, 186 (quoting and adopting Op. Att'y Gen. No. 95-14, pp. 1209-1210 (January 27, 1995)), *writ denied*, 97-1693 (La. 10/13/97), 703 So.2d 613. The supreme court has also stated that to invoke appellate review, an ordinance or law must be declared unconstitutional in the judgment. *See Barber v. La. Workforce Comm'n*, 17-750 (La. 6/5/17), 221 So.3d 38; *Meaux v. Galtier*, 07-2474 (La. 1/25/08), 972 So.2d 1137; and *Burmaster v. Plaquemines Par. Gov't*, 07-1311 (La. 8/31/07), 963 So.2d 378. In fact, the supreme court determined that, despite a discussion of a statute's constitutionality in the trial court's reasons for judgment, "it is well-settled law that the district court's oral or written reasons form no part of the judgment. In the absence of [a] declaration of unconstitutionality in the district court's judgment, this court lacks appellate jurisdiction." *Barber*, 221 So.3d at 39.

Although the trial court stated in its oral reasons that it found both of Appellees' arguments applicable, the trial court did not state that the ordinance was

unenforceable. Most importantly, the trial court's judgment does not contain any decretal language stating the ordinance is unenforceable, invalid, or unconstitutional. Accordingly, we dismiss Appellees' motions to dismiss for lack of jurisdiction.

**EXCEPTION OF NO RIGHT OF ACTION:**

Appellees also filed an exception of no right of action with this court on May 27, 2020, following this court's request that certain documents be produced. On April 14, 2020, this court requested that the parties produce certain maps of Lake Martin and the "St. Martin-Lafayette Game and Fish Preserve" described by applicable statutes, as well as Louisiana Department of Wildlife and Fisheries' [LDWF] regulations "pertaining to the 'St. Martin-Lafayette Game and Fish Preserve' and/or the enactment of 1950 La.Acts No. 337, La.R.S. 36:610 and/or La.R.S. 56:801[.]" The parties were given a deadline of May 1, 2010 to produce the documents.

Citing to Uniform Rules—Court of Appeal, 1-3, Appellees object to these documents because they were not submitted as evidence to the trial court. Furthermore, Appellees assert that Appellant has no right of action to maintain a suit based on the requested maps and regulations, as that right belongs to LDWF.

This court's majority opinion does not utilize the requested documents and affirms the trial court's judgment. Therefore, we deny the exception of no right of action.

**APPELLANT'S ASSIGNMENTS OF ERROR:**

> The standard of review for the issuance of a permanent injunction is the manifest error standard. The issuance of a permanent injunction takes place only after a trial on the merits in which the burden of proof is a preponderance of the evidence, but a preliminary injunction may be issued on merely a *prima facia* showing by the plaintiff that he is entitled to relief. Notably, parties may agree to consolidate trial on the

merits of a permanent injunction with the judgment issuing a preliminary injunction.

*Mary Moe, L.L.C. v. La. Bd. of Ethics*, 03-2220, pp. 9-10 (La. 4/14/04), 875 So.2d 22, 29 (citations omitted).

In *Mary Moe, L.L.C.*, the trial court orally granted a preliminary injunction. Thereafter the parties stipulated that "they would waive their right to a trial on the merits and consent to entry of a final judgment and a permanent injunction[.]" *Id.* at 26. In determining the standard of review, the supreme court stated:

> In this case, the parties agreed to a consolidation of the trial on the merits and the rule of the preliminary injunction. Under these circumstances, the permanent injunction is not a result of a trial on the merits, but is based on a *prima facie* showing by the plaintiff that he is entitled to a preliminary injunction. Given the stipulation in this case, the court of appeal determined the district court used the standard for granting a preliminary injunction, i.e. a *prima facie* showing, instead of a preponderance of the evidence standard. Thus, the court of appeal held the standard of review for the conclusions made by the district court based on its findings of fact were not subject to the higher burden of proof and, therefore, should not be subject to the higher standard of review. We agree[.]

*Id*. at 29.

In this case, the judgment appealed is one dismissing Appellant's Petition for Injunction with prejudice. Appellant's petition requested that Appellees be prohibited from conducting commercial activity and, originally, requested that any buildings violating the setback ordinance be removed/moved. The petition also specifically requested both preliminary and permanent injunctive relief. In Appellees' amended answer, they state, "Recently, counsel for Plaintiff has requested consent of undersigned counsel to try both the preliminary and permanent injunction at a consolidated trial on the merits." The amended answer continues, "Now that a permanent injunction is being brought before the Court, it is necessary that defendants file their compulsory reconventional demand." Similar to *Mary Moe,*

13

*L.L.C.*, the parties agreed to consolidate the preliminary injunction and permanent injunction. However, unlike in *Mary Moe, L.L.C.*, a trial with evidence and testimony was held, resulting in the dismissal of St. Martin Parish Government's Petition for Injunction with prejudice. Although the trial court does not indicate whether it used the standard for a preliminary or permanent injunction, because there was a trial with evidence, we will use the standard of review applicable to permanent injunctions—the manifest error standard of review. *Mary Moe, L.L.C.*, 875 So.2d 22.

**1.    Did the SMPG Zoning Ordinance prohibit commercial activity in the area in which Champagne's business was located?**

This issue was not specifically presented to the trial court, although the determination of whether commercial activity is prohibited at Appellees' location would be a finding necessary to examining the vested rights issue because if commercial activity is not prohibited at Appellees' location, then there is no conflict. Although the trial court found that the zoning map was poor and did not include zoning designations, it also stated, "Both of them [the sides of the road] are in the W-2 zone, so it would have no bearing in this particular case." Therefore, it seems that the trial court did conclude that the W-2 zone applies to Appellees' location, which, according to the ordinance in evidence, does not permit commercial activity. Thus, we find no manifest error in the trial court's oral finding that the W-2 zoning designation applies.

**2.    Were the permits issued improperly because of the prohibition of commercial activity in zone W-2?**

The parish has readily admitted to issuing the permits despite the W-2 zoning designation. Additionally, Appellant's witness, Chester Cedars, testified that he believes the permits were the result of an administrative error. The trial court

concluded that Mr. Champagne obtained the necessary permits and built the building "unbeknownst to him that it was zoned in a W-2 zone which probably would not have allowed that building to be built." Furthermore, the trial court stated, "The parish government is under a duty to know the ordinances and know what the regulations are. . . . But he got the permit." The trial court continued, "The parish government, in this particular case, is now coming in and trying to shut it down because it made a mistake, not Mr. Champagne."

The evidence also shows that Mr. Champagne was issued a permit for a grocery/bait shop. As a grocery/bait shop would be in contravention of a W-2 zoning district, we find no manifest error in the trial court's factual finding, presented in its oral reasons, that the parish improperly issued Appellees permits to build a commercial building.

**3.    Was SMPG arbitrary in attempting to enforce its zoning ordinance in this case and does the "vested right" doctrine apply in a case in which the issuing authority (SMPG) did not act arbitrarily?**

Although listed as separate issues, Appellant presents a joint argument in its brief. Appellant argues that a vested right in a building permit does not equal a vested right in the conduct conducted in that building. Further, Appellant argues that when a permit is erroneously issued in contravention of zoning rules, no vested right is acquired.

Appellant was the proper party to institute an action to restrain or correct any ordinance violations. La.R.S. 33:4728.[1] Appellant first attempts to distinguish cases

---

[1] Louisiana Revised Statutes 33:4728 provides:

> In case any building or structure is erected, structurally altered, or maintained, or any building, structure or land is used in violation of R.S. 33:4721 through R.S. 33:4729 or of any ordinance or other regulation made under authority conferred thereby, the proper local authorities of the municipality, in addition to other remedies, may institute any appropriate action or proceedings to prevent such

15

relied on by Appellees by asserting that those cases deal with revoking building permits and the vested rights in the permit to build the structure. Appellant argues that, in this case, the issue is whether Appellees have a vested right in the activity being conducted in the building. However, we note that a determination that Appellees can keep the building but may not run any commercial activities out of it would render the building nugatory. The purpose of the building was to run commercial activities and the Parish was put on notice of this intent when Mr. Champagne applied for his first permit to construct a grocery/bait shop. Thus, we find the cases dealing with vested rights in permits to build structures relevant.

Appellant cites to *Nassau Realty Co., Inc. v. City of New Orleans*, 221 So.2d 327 (La.App. 4 Cir. 1969), wherein the plaintiff permit owner sought a reversal of the zoning board's denial of his building permit variance application. Although initially given a permit to begin residential construction, the city cancelled the permit approximately two weeks later, after construction was begun, due to insufficient lot area. The plaintiff sought a variance and was denied. The fourth circuit in *Nassau*, 221 So.2d at 330-31, stated (emphasis added):

> If plaintiff has sustained a loss and has been subjected to undue hardship through no fault of its own but as a result of the Director of the Department of Safety and Permits having erroneously issued a permit upon which it relied, **it may have a just grievance against that Department. However, we express no opinion with respect to that aspect of the case.** Whatever remedy it might have, however, does not lie in any action which will merely pass the hardship on to its neighbors whose property would be reduced in value by the granting of the variance.

---

unlawful erection, structural alteration, maintenance, or use, to restrain, correct, or abate such violation, to prevent the occupancy of the building, structure, or land, or to prevent any illegal act, conduct, business, or use in or about such premises.

Unlike the current case, however, the court in *Nassau* found that any hardship created was the fault of the plaintiff, who was "thoroughly acquainted with the zoning regulations of that particular locality[,]" for failing to obtain a variance prior to the purchase of the property. *Id.* at 330. Additionally, the court found no error in the trial court's finding that no evidence of the city's arbitrariness was presented. Thus, the trial court and zoning board's decision was affirmed.

In *Pailet v. City of New Orleans, Dep't of Safety and Permits*, 433 So.2d 1091 (La.App. 4 Cir.), *writ denied*, 440 So.2d 757 (La.1983), the appellate court determined that the city's stop work order was justified and that the plaintiffs had not acquired vested rights in an erroneously issued building permit. The plaintiffs were issued a stop work order after they purchased a residential property and renovated it as a four-plex—a nonconforming use. The plaintiffs argued that they had a vested right in a previously issued construction permit, which authorized $5,000 in renovations. However, the permit was issued only after the city advised the plaintiffs that they must submit proof that the property enjoyed a nonconforming use status, which evidence they submitted, and the city erroneously reviewed. The plaintiffs then began renovations and, ten months later, a stop work order was issued.

The fourth circuit concluded:

> The Trial Judge held that Dr. and Mrs. Pailet had a vested right in the permit, relying on *Dunn v. Parish of Jefferson, supra*, wherein the Court held that a permittee had acquired a vested right because there was no misrepresentation by the applicant to induce the issuance of the permit. We do not believe that *Dunn* is controlling. In *Dunn*, this Court found that the permit was properly issued, that the permittee was justified in relying on it, and that the Jefferson Parish Council could not revoke it. The instant case is clearly distinguishable because the permit for the renovations was improperly issued. **Additionally, we believe that Dr. and Mrs. Pailet's reliance on the issuance of the permit in this case was unjustified because the evidence shows that they were aware that the property had not been rented to anyone in 1977 and certainly not since Mrs. Ponder's departure in 1978. These facts**

17

**should have made them aware that the nonconforming status was questionable.** In fact, the nonconforming status was lost because the nonconforming use was interrupted (suspended) for a period of more than six months. See Art. 12, Sec. 2 of the Comprehensive Zoning Ordinance of the City of New Orleans. **Furthermore, even if we found that Dr. and Mrs. Pailet could rely upon the permit, although erroneously issued, they could not have relied upon a $5,000.00 permit as authorization for renovations that cost $50,000.00.**

*Id*. at 1095-96 (emphasis added). Thus, the current case is factually distinct from *Pailet* where the trial court found that the plaintiffs were unjustified in relying on the issued permit where the plaintiffs should have known there was no nonconforming use status.

Similarly, in *Ellsworth v. City of New Orleans*, 13-84 (La.App. 4 Cir. 7/31/13), 120 So.3d 897, the fourth circuit found the vested rights doctrine inapplicable where a homeowner's request for a variance was denied. The home had a five-foot encroachment on a setback requirement, but was considered an existing, nonconforming use. The homeowner obtained a permit to conduct some renovation, but the permit did not cover exterior or structural work or demolition. Despite this fact, the homeowner demolished half of the structure, including the existing encroachment on the setback requirement. Thereafter, the homeowner obtained a second permit to construct an addition and porch. Several months later, the city issued a stop work order, asserting that the homeowner exceeded the scope of the permit and that the new structure encroached on the setback requirement. The zoning authority thereafter denied her request for a variance, finding that the nine variance criteria were not met. The homeowner appealed the variance denial and raised, among other arguments, the argument that she detrimentally relied on the permits issued. The district court found that she had a vested right in the permits. In reversing, the appellate court concluded that the zoning authority was not arbitrary,

capricious, and that it did not abuse its discretion in denying the variance. Additionally, the appellate court concluded that the homeowner was not justified in relying on the permits after she failed to disclose information when obtaining the permits and was issued multiple stop orders for exceeding the scope of the permits. Specifically, the court stated:

> In finding the vested rights doctrine inapplicable, we further note that the doctrine "applies by its own terms only to arbitrary revocation of a *valid* building permit," and that "[n]othing in the record gives the [property owner—here Ms. Ellsworth] the right to build a structure that violates the City's Comprehensive Zoning Ordinance." *St. Raymond* [*v. City of New Orleans*, 99-2438, p. 4 (La.App. 4 Cir. 5/17/00)], 769 So.2d [562] at 569–70 (Waltzer, J., dissenting). . . . **Accordingly, the district court's finding that Ms. Ellsworth justifiably relied on the permits she was issued is not supported by the record**; and the district court's reliance on the vested rights doctrine is misplaced.

*Id.* at 907 (emphasis added).

On the other hand, Appellees rely on the following cases, which resulted in the property owner acquiring vested rights in the permits, and which we find instructive.

In *St. Raymond*, 769 So.2d 562, the appellate court held that a developer had a vested right in a building permit and issued a preliminary injunction preventing the city from enforcing a stop work order. In reaching its decision, the fourth circuit stated:

> Relevant to this inquiry is the following language from 13 Am Jur.2d Buildings § 10, adopted by this court in *Dunn v. Jefferson Parish,* 256 So.2d 664 (La.App. 4 Cir. 1972), *writ denied,* 260 La. 1137, 258 So.2d 382 (1972):

>> It has been generally held that a municipal building permit or license may not arbitrarily be revoked by municipal authorities, particularly where, on the faith of it, **the owner has incurred substantial expense**. Such a permit has been declared to be more than a mere license revocable at the will of the licensor. When in reliance thereon, work upon the building is actually commenced

> and liabilities are incurred for work and material, the
> owner acquires **a vest property right** to the protection of
> which he is entitled.

> *Id.* at 667 (emphasis added). Under the above principle, this court must
> answer the following two questions in order to determine whether Mr.
> St. Raymond is entitled to issuance of the preliminary injunction under
> the exception to the "irreparable injury" requirement: (1) whether the
> City's decision to revoke the building permit was arbitrary, and (2)
> whether, on the faith of the building permit, Mr. St. Raymond incurred
> substantial expense. If the answer to those two questions is "yes," Mr.
> St. Raymond has acquired a constitutionally-protected vested right in
> the building permit "of which [he] cannot now be deprived." *Id.*

*Id.* at 565. Thereafter, the court determined that the city's actions were arbitrary because the city passed an ordinance "authorizing the conditional use of the property for the construction of townhouses," which had not lapsed, and then issued the permits to the plaintiff. *Id.* The city issued a stop work order, but then lifted it, before issuing a second stop work order. Importantly, the court noted,

> This is not a case where the City issued a building permit, then found it
> was invalid and revoked it; the City reviewed this building permit
> several times, and yet never documented any defect in the permit itself.
> The City's documents reveal that the second Stop Work order was not
> issued because the building permit was improperly issued; it was issued
> because the City Council revoked the conditional use ordinance.

*Id.* at 565-66. Similarly, Appellant issued not one, but three building permits to Appellees over the course of two years. Additionally, Appellant visited Appellees' location before issuing the second and third permits. Furthermore, Appellees were cleared for selling alcohol by the parish government and by planning and zoning.

Likewise, in *Cuccia v. Board of Zoning Adjustments of/and the Parish of Jefferson*, 07-152 (La.App. 5 Cir. 7/30/07), 966 So.2d 611, the fifth circuit also found that the plaintiff had a vested right in a structure for which he obtained a permit. The set of facts are similar to the present case:

> Jay Cuccia sought a permit to construct a two story accessory building
> which included a garage and patio. DICE reviewed Mr. Cuccia's plans

20

three times, requiring necessary changes. Mr. Cuccia made the necessary changes each time and resubmitted the plans to assure compliance with the building Code. When the building permit was issued Mr. Cuccia began construction. He poured the slab, and roughed in the plumbing. At the inspection which occurred at that point DICE did not notify Mr. Cuccia that the permit was issued in error. Thereafter Mr. Cuccia framed the building according to the original permit. Apparently after the building was framed, various neighbors made complaints that the building height did not comply with the Jefferson Parish building code. At issue was a part of the second story nearest the street which was measures 11 feet by 5 feet in dimension. The balance of the second story is in code.

On March 22, 2005, thirty-seven days after the building permit was issued and after the building had been framed, DICE informed Mr. Cuccia by letter that the building permit was suspended because [it] had been issued in error as the structure exceeded the maximum height allowed of thirteen feet. The letter further instructed Mr. Cuccia to either file for a variance of the code requirement, or submit drawings that comply with the code. Mr. Cuccia became aware of this letter about two weeks later when he returned from vacation. At that time he telephoned the building permit office and was told the letter was not a stop work order and that he could apply for a variance. Mr. Piglia, a representative of DICE also told Mr. Cuccia that he could close up the building in order to render it water tight. On May 16, 2005, a stop work order was posted on Mr. Cuccia's door. On the next day Mr. Cuccia filed a request for a variance with the Board.

*Id.* at 612-13. Like Appellees' argument, the plaintiff asserted that "he began construction in good faith, relying on the fact that DICE [the code enforcement] had reviewed the plans on more than one occasion, and had ultimately approved the changes and issued a building permit." *Id.* at 613-14. The plaintiff argued he had a vested right in the building and that the board was arbitrary and capricious in denying his variance request. The fifth circuit stated:

We are mindful that our jurisprudence holds that the mere fact that a building permit was issued in error and contrary to the laws of the city does not vest an irrevocable right to proceed under that permit if there is subsequent action canceling the permission previously granted. However, fairness and our jurisprudence confirms that when a homeowner relies in good faith and to his detriment on a building permit issued by DICE, and incurs expense as a result, he has a vested right.

21

*Id.* at 614. The *Cuccia* decision differs slightly from the case at issue as the plaintiff appealed the variance denial by the board—which is not the present situation. Because *Cuccia* involved appealing a board decision, the board had to make factual determinations and then "act in a manner that is legally permissible and not arbitrary and capricious." *Sciortino v. La. State Bd. of Cosmetology*, 194 So.2d 409, 411 (La.App. 4 Cir. 1967). Thus, the *Cuccia* court continued:

> There is a prima facie presumption of validity which attaches to zoning board action. To overcome that presumption, a plaintiff must show the zoning board acted arbitrarily. The opponent must show that the board's action bears no relation to health, safety or the public's general welfare. The burden is on the appellant to affirmatively show the board abused its discretion or its decision was in excess of its jurisdiction or otherwise erroneous as a matter of law. A reviewing court cannot substitute its own judgment or interfere absent a showing by the appellant or relator that the Board was arbitrary and capricious or abused its discretion.
>
> Our review of the decision of the Board shows that it did not consider Mr. Cuccia's argument that he should have been allowed to rely on the issuance of the building permit through which he acquired a vested property right. . . .

*Cuccia*, 966 So.2d at 615 (footnotes omitted). Under the facts of the case, the *Cuccia* court found that the board acted arbitrarily. Furthermore, the court concluded:

> While we do not set a bright line standard that this occurs at a particular point in time, certainly, when the home owner acts in good faith reliance upon the building permit which was issued after multiple occasions of interaction with the permitting authority, and that homeowner has prepared the lot, poured the slab, roughed in the plumbing, undergone a subsequent inspection and framed the structure, that homeowner has gained that property right.

*Id.* at 616.

In the present case, the appeal does not stem from the parish's decision to deny a variance request. However, as in *Cuccia*, Appellees relied on the original permit specifically indicating that it was for a "Grocery/Bait Shop" "Zone No. C" for nearly five years before being notified that the permit was issued improperly.

22

Further, the parish president and the Planning and Zoning Coordinator visited Appellees' location prior to issuing the two 2013 permits. Appellees were also approved for a liquor/beer permit, which was given Appellant's clearance, signed by then parish president, Guy Cormier, on June 28, 2011, as well as the "Planning and Zoning Clearance" on June 22, 2011. Thus, as in *Cuccia*, Appellees had multiple interactions with the parish throughout the process of obtaining the necessary permits. Additionally, Appellees' business is fully built and operational.

Thus, it was arbitrary for Appellant to enforce the ordinance after its multiple interactions with Appellees, including the on-site visit and its approval of various permits to operate the business. Under the facts of this case, Appellees relied in good faith, to their detriment, on the permits issued by the parish and have incurred expense as a result. Thus, Appellees have acquired a vested right. We find no manifest error in the trial court's judgment dismissing St. Martin Parish Government's petition for injunction.

**DECREE:**

For these reasons, Appellees' motions to dismiss appeal are denied, Appellees' exception of no right of action is denied, and the trial court's judgment is affirmed. Each party is to bear the cost of their own appellate filing fees. Pursuant to La.Code Civ.P. art. 2164 and Uniform Rules—Courts of Appeal, Rule 1-3, we tax Plaintiff-Appellant, St. Martin Parish Government, with trial and appellate court costs amounting to $9,000.05 ($335.50 appellate filing fee, $1889.50 cost for appeal, $6,775.05 trial court costs), in accordance with La.R.S. 13:5112.

**MOTIONS TO DISMISS DENIED; EXCEPTION OF NO RIGHT OF ACTION DENIED; JUDGMENT AFFIRMED.**

# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## NUMBER 19-499

ST. MARTIN PARISH GOVERNMENT

VERSUS

BRYAN CHAMPAGNE, ET AL.

**CONERY, Judge, dissents and assigns reasons.**

Bryan Champagne and his wholly owned companies applied for and obtained building permits from St. Martin Parish Administrators allowing him to construct a grocery/bait shop, and decks, piers, wharfs and docks from which he operates commercial boat tours and canoe and kayak rentals on Rookery Road, a parish road on Lake Martin not zoned for that purpose. Realizing it had mistakenly issued permits to construct buildings and improvements on a statutorily created public lake and protected game, fish and nature preserve,[1] the Parish, using its zoning ordinance and acting pursuant to the mandates of Article 1, Section 9 of the Louisiana Constitution, the Public Trust Doctrine, filed an injunction suit against Mr. Champagne and his companies. The trial judge denied the injunction based on an estoppel theory, the "Vested Rights" doctrine, holding that since Mr. Champagne relied on erroneously issued permits and invested heavily in his commercial business ventures, he had a "Vested Right" to continue his commercial business operations and denied the injunction. The majority affirms his decision.

---

[1] The American Standard Dictionary defines "preserve" as: "1. To maintain in safety from injury, peril, or harm; protect; … 3. An area maintained for the protection of wildlife or natural resources."

I respectfully dissent.  Mr. Champagne cannot acquire a "vested right" to operate a commercial business from structures he built on Lake Martin, a statutorily created and State controlled fish, game and nature preserve.

## INTRODUCTION AND HISTORICAL PERSPECTIVE

In order to better understand the legal issues involved in this case, it is important to examine the history of Lake Martin.  Present day Lake Martin was created by Legislative Act 337 in l950[2] from existing lakes in St. Martin Parish, Lake

_____

[2] 1950 La. Acts No. 337 provides in relevant part:

AN ACT

To establish the St. Martin-Lafayette Game and Fish Preserve out of Lakes Martin in St. Martin Parish and Lake Charlo in Lafayette and St. Martin Parishes; creating a Commission to administer and govern the same under the supervision of the Department of Wild Life and Fisheries, and designating the domicile thereof; to provide for the acquisition of additional lands or water bottoms by donation, purchase or expropriation whenever necessary, to provide for the erection of levees, dams, dykes, and drains, and the maintenance thereof; to provide that private individuals may retain their mineral rights in, on or under any lands leased or upon which a servitude has been granted to said Commission; to provide that all rules and regulations of said Game Preserve shall be adopted and promulgated by the Commission after first being approved by the Department of Wild Life and Fisheries; and repealing all laws or parts of laws in conflict herewith.

**Section 1.     Be it enacted by the Legislature of Louisiana, that there is hereby created the St. Martin-Lafayette Game and Fish Preserve out of Lake Martin in the Parish of St. Martin, and Lake Charlo in the Parishes of St. Martin and Lafayette; that the territory comprising said Preserve shall be all that land below mean high water mark as shown on the meandering lines of said Lakes Martin and Charlo on a survey by the Department of Public Works, as now of record, until new lines and boundaries be defined by surveys made by the Department of Public Works; and the Commission in charge of the St. Martin-Lafayette Game and Fish Preserve shall have authority and control extending one-half mile beyond such boundaries now established, or that may be established**. (Emphasis added.)

Section 2.     That there is hereby created the St. Martin-Lafayette Game and Fish Commission to be composed of nine members, to be named by the Governor, and to serve each for a term of four years, after the first term, and the first term of the members shall expire July 1st, 1952.

Section 3.     That the domicile of said Commission shall be in Breaux Bridge in the Parish of St. Martin.  Under the supervision of the Department of Wild Life and Fisheries, said Commission shall have the right to administer and govern said Game and Fish Preserve, to adopt and promulgate rules and regulations

LaPointe and Lake Charlo, partially in Lafayette Parish. Both areas are located within an area known as The Cypress Island Region situated between Lafayette and Breaux Bridge and northwest of St. Martinville and Parks, Louisiana. "Cypress Island" was so named because of the large stand of virgin cypress in the area and was historically part of an expansive bottomland hardwood forest and cypress-tupelo swamp.[3]

Act 337 of 1950 enabled the Louisiana Department of Public Works to construct a levee around the low lying area containing Lake LaPointe resulting in the formation of present day Lake Martin. The State constructed levee encircles approximately 765 acres, and approximately 200 acres are open waters of what was formerly Lake LaPointe, now part of Lake Martin.

Pursuant to the Act, the State was authorized to purchase property or obtain a permanent servitude over all private lands within the State constructed levees. The purpose was to create a game and fish preserve, originally managed by a special commission formed by the St. Martin and Lafayette Parish Governments, with regulations to be approved by the State "Department of Wild Life and Fisheries."

Subsequent legislative acts transferred the local commission's responsibilities, along with management and control of Lake Martin, to the Louisiana Department of Wildlife and Fisheries (LDWF), which now maintains

––––––––––––––––

which must first be approved by the Commissioner of Wild Life and Fisheries, and to do all things necessary to the propagation and conservation of game and fish in the preserve.

[3] For a general overview of the history of the Lake Martin and Cypress Island area, *see* NANCY CAMEL, THE NATURE OF THINGS AT LAKE MARTIN (2006). The book was published in 2006 and is cited for historical reference purposes only and not for the factual accuracy of anything therein contained.

supervisory authority over Lake Martin.  *See* La.R.S. 36:610[4] and La.R.S. 56:801.[5]

*See also* La.R.S. 56:802.[6]

Part of the levee constructed by the State Department of Public Works

surrounding and impounding the Lake was used as a roadway to access the Lake,

_____

[4] Titled "Transfer of agencies and functions to Department of Wildlife and Fisheries," Louisiana Revised Statutes 36:610 provides, in pertinent part:

> C. Notwithstanding any provisions of R.S. 56:801 to the contrary, the game and fish commissions created by the following Acts, as amended, are hereby abolished, and their powers, duties, functions, and responsibilities are transferred to the secretary of the Department of Wildlife and Fisheries and hereafter shall be exercised and performed as provided in Part IV of Chapter 22 of this Title, and the game and fish preserves created by the following Acts, as amended, are hereby placed within the Department of Wildlife and Fisheries and shall exercise and perform their powers, duties, functions, and responsibilities as provided for agencies transferred in accordance with the provisions of Part II of Chapter 22 of this Title. Any parish or parishes, by formal resolution of the governing authority of each parish affected, pursuant to R.S. 56:721 et seq., may appoint a game and fish commission which may exercise those powers, duties, and functions provided in R.S. 56:721 et seq. in relation to the game and fish preserves for which commissions are hereby abolished.

> . . . .

> (8) St. Martin-Lafayette Game and Fish Preserve (Act No. 337 of 1950 Regular Session, as amended).

[5] Titled "Particular game and fish preserves and commissions recognized and continued," La.R.S. 56:801 provides, in pertinent part:

> The following preserves and commissions created by the enumerated special statutes, are continued in full force and effect within the Department of Wildlife and Fisheries:

> ….

> (20) St. Martin-Lafayette Game and Fish Commission (Acts 1950, No. 337; Acts 1966, No. 455; Acts 1970, No. 390; Acts 1977, No. 222, § 1).

[6] Titled "Responsibilities and duties," La.R.S. 56:802 provides:

> The department shall have the duty and responsibility for the management of resources, including water level control, aquatic weed control, and maintenance and repair of dams, control structures, and spillways within the territorial jurisdiction of each commission established in R.S. 56:801, provided that no local commission or authority is providing these services. The individual game and fish preserves and commissions or local governing authorities shall have the duty and responsibility for maintaining all support services within their territorial jurisdiction, including parks, picnic areas, and concessions.

4

originally known as "Levee Road," and that road was eventually accepted by St. Martin Parish as a parish road.

The Nature Conservancy received donations of over two thousand acres of the cypress-tupelo swamp area surrounding Lake Martin and purchased additional acreage, creating what is today known as the "Cypress Island Preserve."[7] The Nature Conservancy established a "rookery" on the property. Lake Martin has since become one of the largest wading bird nesting areas in the country. The Parish subsequently changed the name of "Levee Road" to "Rookery Road," which is still maintained by the Parish. The road does not completely encircle Lake Martin. The remaining levee is used as a hiking/nature trail for enjoyment of nature, bird watching, and for photographing the many birds and wildflowers at the lake and its environs. Mr. Champagne's commercial businesses were constructed on the Lake Martin side of "Rookery Road," within the boundaries of Lake Martin and the preserve.

The Parish also has within its road system another parish road known as Lake Martin Road, which connects to La. Highway 31 between the communities of Parks and Breaux Bridge, ending at Rookery Road. Lake Martin Road provides easy access to visitors to the lake and to boaters to access a public boat landing constructed near the intersection of Lake Martin Road and Rookery Road on the lake side of the levee, and is near Mr. Champagne's business.

## FACTS AND PROCEDURAL HISTORY

Turning to the history of the litigation between St. Martin Parish and Bryan Champagne, testimony and evidence in the record shows that Mr. Champagne is a

_____

[7] *See* www.nature.org/en-us/get-involved/how-to-help/places-we-protect/cypress-island.

5

native and lifelong resident of St. Martin Parish and had worked at Martin Mills, a local garment factory, for many years before it closed. When his job ended, Mr. Champagne, who also owned a "crawfish skiff," began using his skiff to take people on boat tours of nearby Lake Martin. He had no commercial business location at the lake and operated his business from his home for over fourteen years, meeting customers at the Lake Martin Boat Landing. According to his trial testimony, Mr. Champagne explained that Mr. Ronald Massicot, a landowner abutting Lake Martin, offered to lease property to him from which he could expand his single boat tour operation. The two came to terms and signed a ten (10) year lease with options to renew. The lease is not in the record. From that point on, Mr. Champagne then began building and expanding his businesses. The problem is Mr. Champagne constructed his buildings and is operating his commercial business enterprise in a legislatively created State owned and/or controlled fish, game and nature preserve where no commercial businesses are allowed. There is nothing of record to allow Mr. Champagne to lease that portion of the property on the lake side of the levee, all of which is subject to the permanent servitude created by Act 337 and continued by subsequent legislative acts noted infra. Likewise, there is nothing of record from LDWF, the State entity that has legislatively delegated control over the lake, that would allow commercial buildings as constructed and used by Mr. Champagne on the lake side of the levee.

The record reflects that instead of consulting with LDWF, Mr. Champagne went to the Parish Permit Office to obtain a building permit for a grocery/bait shop he wanted to open and from which he would operate his commercial boat tour business. Mr. Champagne gave the Parish permit department the wrong address for his initial building permit, "1076 Rookery Road." The addresses on Rookery Road

6

**are on the land side of the levee**. **Anything on the Lake side of the levee is Lake Martin and part of the State preserve**. Notwithstanding the fact that Mr. Champagne had operated his "crawfish skiff" boat tour business for fourteen (14) years using the public boat landing, was intimately familiar with the lake and could readily ascertain that there were no buildings or permanent structures on the lake side of the levee, he gave the Parish the address 1076 Rookery Road, claiming that was the address he obtained from the "911 Commission." The Parish has taken the position that there was nothing on the face of Mr. Champagne's initial building permit application to alert St. Martin officials that Mr. Champagne's original grocery/bait shop were going to be constructed on the lake side of the levee in a State controlled fish, game, and nature preserve. The question of whether Mr. Champagne was in good faith in requesting his building permit for "1076 Rookery Road," or intentionally misled the Parish, will be relegated to trial on his reconventional demand for damages. As discussed below, that demand was severed from the trial court's consideration of the present issue of the Parish's request for injunctive relief.

At this point, it should be noted that the "Lessor" of the property, Mr. Massicot, had no legal right to lease property on the lake side of the levee, an area totally within Lake Martin and part of the preserve owned and/or managed by the LDWF.[8]

At the time Mr. Champagne first opened his grocery/bait shop, the Nature Conservancy had by then established the Cypress Island Preserve, described infra.[9]

_____

[8] As previously indicated, a permanent servitude was created by legislative authority pursuant to Act 337 of 1950, and continued in operation by La.R.S. 36:610 and La.R.S. 56:801. *See also* La.R.S. 56:802.

[9] *See also* CAMEL, THE NATURE OF THINGS AT LAKE MARTIN.

Mr. Champagne was able to capitalize on the many tourists and visitors who come to Lake Martin to enjoy the birds, flowers, and beauty of nature at this lake, described at trial by Parish President Cedars as one of the most significant natural areas in St. Martin Parish.

After obtaining his initial grocery/bait shop permit, Mr. Champagne began to rapidly expand his business operations. He built an outside deck, then a covered deck, then a wharf. He also built boat docks and piers in the lake with numerous boat slips on the lake from which he now operates four or five specially designed tour boats, which Mr. Champagne described as "thirty foot long commercial boats." From pictures in evidence, it appears that each boat holds about seventeen (17) people plus the tour boat operator. Mr. Champagne also rents canoes and kayaks. He has a public website advertising his commercial business operations on Lake Martin.[10]

From a very small "footprint" of using one small crawfish skiff to take a few people on guided boat tours on Lake Martin using the public boat landing, Mr. Champagne expanded his business such that he now has a virtual monopoly for the operation of his boat tour and related businesses, all of which are operating on this State controlled, ecologically significant public lake. The record reflects that no further "permits" were issued by the Parish for any commercial business on the lake to anyone else and none are reflected in the record of this case nor are any likely to be issued. Likewise, no permits from LDWF are in the record.

_____

[10] *See* www.champagnesswamptours.com. Pictures from his website and Google Earth were entered in evidence as Exhibits 14-16 and clearly show all of Mr. Champagne's buildings, docks, wharfs, roof, deck, and piers are on the lake side of the levee.

Because the State constructed levee encloses Lake Martin,[11] the levee is the "highwater mark" of the lake. **Hence everything on the lake side of the levee is part of Lake Martin and the Parish had no legal authority to issue a building permit to Mr. Champagne on Lake Martin.** Yet it did so with approval of the then Parish President/Administrator.

How was this allowed to happen? The record is silent as to why the LDWF has not acted independently and/or intervened to stop Mr. Champagne's commercialization of this ecologically significant State owned and/or managed preserve. The record is also silent as to how Mr. Champagne was able to construct a building, with public restrooms, wharfs, decks, docks and boat slips on Lake Martin without appropriate permits from the U. S. Army Corps of Engineers. From pictures in evidence and Mr. Champagne's public website, Mr. Champagne also appears to have a fuel tank on site from which he can provide fuel to his tour boats. The record likewise does not show where or how effluent and wastewater from his public restroom(s) are handled.

From materials submitted as part of Trial Exhibit 13, we learn that in 1999-2000, long before Mr. Champagne applied for permits to construct his grocery/bait shop on the Lake, the U.S. Army Corps of Engineers and St. Martin Parish Government authorized a "master plan" for Lake Martin. The Corps, the Parish, the LDWF, the Louisiana Department of Natural Resources (LDNR), and the Nature Conservancy were to compile the master plan, referenced as the "Lake Martin

_____

[11] The Department of Public Works constructed the levee, additional pumping stations and related items necessary to maintain the lake, and maps of the proposed construction and of the completed Lake Martin are on file at the State Land Office pursuant to La.R.S. 41:1701.1.

Master Plan 2001." That Master Plan is not in the record, so we have no way of knowing whether it was adopted or exactly what each party's responsibilities or areas of concern may be.

However, the law gives the Corps the responsibility to review and issue wetlands area permits for any permanent additions such as docks, decks, wharfs, and piers in a wetlands area, pursuant to the Rivers and Harbors Act, 33 U.S.C. § 401, *et seq*.

The Act provides for the U.S. Corps of Engineers regulation of structures over navigable waters. Section 403 provides that:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

In addition, 33 U.S.C. § 1344 of the Clean Water Act regulates the discharge of dredged or fill material into navigable waters, including, under certain circumstances, those identified as wetlands. *See, e.g., Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 121 S.Ct. 675 (2001); *U.S. v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455 (1985).

Pertaining to what is commonly referred to as a Section 404 permit, 33 U.S.C. § 1344(a) states:

**(a) Discharge into navigable waters at specified disposal sites**

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

Absent a controlling agreement in the Master Plan or a waiver, Mr. Champagne should have been required to obtain a Corps permit or permits **before building any structure on the Lake and before building wharfs, docks, decks, and piers from which he now operates his motorized boat tour business and other commercial business on the Lake, assuming he could do so with LDWF approval**. There is no permit from the Corps or LDWF in the record, nor is there a waiver to show that Mr. Champagne had proper authorization to construct and operate his commercial enterprises on the lake side of the levee.

But the record is not silent as to how Mr. Champagne obtained Parish "building permits" to construct and expand his grocery/bait shop, and to build his decks, roofs, docks, wharfs, and piers, and obtain his alcohol permits. He got those permits directly from Administrators at St. Martin Parish Government through what present Parish President Chester Cedars now labels "an administrative error."

After obtaining his first building permit for his grocery/bait shop with the wrong address listed, Mr. Champagne then applied for and obtained building permits for his decks, roof, wharf, and boat dock expansions. According to his deposition testimony, the then Parish President/Administrator actually visited Mr. Champagne's location personally, along with the then director of the permits section, and gave the O.K. to issue the permits with the condition that Mr. Champagne "not

operate a bar" from this location. When asked why he had allowed the new permits in the Lake, the then Parish President stated:

A    …And I think as an effort of me as being a leader in this Parish saying, If we can work with you to - - to keep your tour boat operations going, they got - - he's more than - - than him operating tours out [of] that lake, we would, you know, we would work with him to do that. I think that's probably what my intent was, to just help him to continue what he seemed to be - - it almost sounded like, if I recall, like everything other than the tour boat stuff was a problem for him. And so, I - - I think in an effort to try to save the - - maybe we can work without you to keep your tour - - tour boats going.

Q    Okay.

A    That's what he started with anyway.

Q    Correct.

A    So that's probably what my intents were when I said that.

Q    Okay.

A    And I - - I - - I came from business, so I'm a business friendly guy. I'm always gonna try to work with you if you want to work with us ….

Hence, Mr. Champagne is now claiming he has a "vested right" to operate since the latter permits were issued after personal inspections by the then Parish President/Administrator and permit director.

When interested citizens began to complain about Mr. Champagne's business expansion and resulting noise, traffic congestion, and other problems at Lake Martin,[12] the Parish legal advisor, then Mr. Chester Cedars, who is now Parish President, determined that Mr. Champagne could not lawfully operate a commercial business on the Lake Martin side of the levee based on St. Martin Parish Zoning

_____

[12] Many of the problems pertaining to Mr. Champagne's operations are outlined in an intervention filed by Friends of Lake Martin, a private non-profit group discussed more fully infra.

Ordinances. The W-2 zoning ordinance for "Rookery Road," on file in the St. Martin Parish Zoning Office, clearly prohibits commercial operations such as Mr. Champagne's. Mr. Cedars was given authority by the Parish council, acting as its legal advisor, to issue a cease and desist order to Mr. Champagne, introduced at trial as Exhibit 6, advising Mr. Champagne to immediately cease all commercial business operations as he was in violation of the applicable St. Martin zoning ordinance, which did not allow commercial structures or commercial business activity on "Rookery Road", the Parish road originally built by the State and maintained by the Parish on a portion of the State constructed levee encircling Lake Martin. According to Mr. Cedars, Mr. Champagne met with him and at first agreed. Mr. Champagne obviously had second thoughts and refused to cease his commercial business operations on the Lake, resulting in this litigation.

It is especially important to note at this juncture a critical legal issue not discussed by the trial court or the majority. Zoning is a legislative function, and the Executive Branch of Parish Government, which includes the Parish President and Permit Administrator, do not have the authority to issue zoning variances or waivers. *See* 33:4721. *See also King v. Caddo Par. Comm'n*, 97-1873 (La. 10/20/98), 719 So.2d 410 (citing *St. Charles Gaming Co., Inc. v. Riverboat Gaming Comm'n*, 94-2697 (La. 1/17/95), 648 So.2d 1310); *City of New Orleans v. Bd. of Comm'rs*, 93-690 (La. 7/5/94), 640 So.2d 237; *Morton v. Jefferson Par. Council*, 419 So.2d 431 (La.1982); *Folsom Rd. Civic Ass'n v. Par. of St. Tammany*, 407 So.2d 1219 (La.1981); *Four States Realty Co., Inc. v. City of Baton Rouge*, 309 So.2d 659 (La.1974)). The proper procedure would be for the person seeking a zoning variance to apply to the St. Martin Parish Council. There is no dispute that Mr. Champagne's commercial businesses are in violation of the applicable parish zoning ordinances.

Unlike "building permits," public hearings are required for a zoning ordinance, variance, or rezoning. *See* La.R.S. 33:4724, *et seq.* After meeting with Mr. Cedars, Mr. Champagne did request a zoning variance and a public hearing was in fact conducted on May 5, 2016. The St. Martin Parish Council denied the variance after a large and vocal group of St. Martin Parish residents voiced strong opposition, many of whom, as shown by e-mails and letters in the record, focused on the many problems Mr. Champagne's commercial operations brought to this tranquil and protected nature preserve.[13] No appeal was taken from the council's decision representing the citizens of the Parish to deny the zoning variance.

When Mr. Champagne still would not cease and desist his commercial business operations from structures he erected on Lake Martin, the Parish council authorized then Parish Attorney Cedars to institute a suit for temporary and then permanent injunction against Mr. Champagne. Mr. Champagne's claim in his

_____

[13] "Friends of Lake Martin," a private nonprofit consisting of a group of landowners abutting Lake Martin and concerned citizens interested in preserving the Lake from commercial exploitation, filed an intervention. The Petition of Intervention explains in part that:

> The said violations of the Zoning Ordinance have caused the residents of the Lake Martin area to suffer decreased property values and decreased enjoyment of their property and have destroyed the bucolic tranquility of the Lake Martin area generally, which the W-2 zoning districts was designed to preserve, and have otherwise constituted a nuisance under LSA-C.C. art. 667, *et seq.*

Much background information about the lake and its formation and operation is contained in their petition and filings included in this designated record. The answers to interrogatories and deposition testimony of the Intervenors in the record highlighted serious concerns about Mr. Champagne's operations that were completely incompatible with a nature preserve and the purposes for which Lake Martin was statutorily created. The allegations included everything from cutting trees and allowing them to rot in the lake, to improper sewer dumping, installation of a large commercial garbage bin, spillage from fuel tanks and pollutants from fueling and the washing of his tour boats on the lake, loud bands playing on his wharf, night tours of the lake, tourists and boat operators feeding and playing with alligators, including catching a baby alligator during a boat tour, air boats and food trucks (since discontinued), improper parking and signage, noise, dust and other problems related to cars, tour buses, and school buses parking on the narrow road clearly not designed for such use. The record is silent as to why the Intervention was dismissed, but the concerns expressed are in the record and are nonetheless relevant.

amended answer that the zoning ordinance was unconstitutional and his Reconventional Demand for damages were severed by Motion and Order to Sever Claims for Trial signed before trial on the injunction issue.

This case was eventually set for trial on the merits of the injunction issue only on April 9, 2019. Following the presentation of evidence on the merits, the trial court judge ruled from the bench and denied the injunction for oral reasons assigned. This timely appeal followed. I address the Parish's issues for review collectively.

## STANDARD OF REVIEW

"The standard of review for the issuance of a permanent injunction is the manifest error standard of review." *Mary Moe, L.L.C. v. La. Bd. of Ethics*, 03-2220, p. 9 (La. 4/14/04), 875 So.2d 22, 29. In this case, I would suggest that the denial of the requested injunction resulted from an error of law and would review this case *de novo*. *See O'Connor v. Grove Homeowner's Ass'n.*, 19-676 (La.App. 3 Cir. 4/22/20), _ So.3d _ (2020 WL 1934785). Under either standard of review, I would reverse. The trial judge and the majority failed to recognize the legal significance of the difference between an erroneously issued building permit by the Parish President/Administrator and the denial of a zoning variance by the legislative branch, the Parish Council, from which denial Mr. Champagne did not appeal. That legal error was compounded when the trial judge and majority failed to recognize that, based on the administrative error of the then Parish President, Mr. Champagne cannot acquire a "vested right" to operate a commercial business in this statutorily created public fish, game and nature preserve controlled by LDWF.

## LAW AND DISCUSSION

There is no dispute that Mr. Champagne's commercial businesses on Lake Martin are in violation of the Parish zoning ordinance. Rather, in his answer to the

original petition, Mr. Champagne claimed that St. Martin Parish **could not enforce its zoning ordinance in this case** because Mr. Champagne had properly been issued "building permits" for his commercial business operations with the knowledge and approval of the then Parish President/Administrator and Administrator of the Permits Section. His answer claimed that he, therefore, had a "Vested Right" to continue operating his business as he applied for the permits "in good faith" and the permits were "lawfully issued," resulting in expenditure of time, effort and money to construct the buildings, wharfs, docks, decks, roof and piers for the expansion and operation of his commercial boat tour business and related enterprises.

Mr. Champagne cited *Palermo Land Co., Inc. v. Planning Comm'n of Calcasieu Par.*, 561 So.2d 482 (La.1990); *St. Raymond v. City of New Orleans*, 99-2438 (La.App. 4 Cir. 5/17/00), 769 So.2d 562; *Cuccia v. Bd. of Zoning Adjustments of/and Par. of Jefferson*, 07-152 (La.App. 5 Cir. 7/30/97), 966 So.2d 611; and *Dunn v. Jefferson Par.*, 256 So.2d 664 (La.App. 4 Cir.), *writ denied*, 258 So.2d 382 (La.1972) in support of his vested rights argument.

Mr. Champagne references a footnote in *Palermo*, 561 So.2d 482 for the proposition that the Louisiana Supreme Court has recognized the vested rights doctrine. In his brief to this court, he asserts that the supreme court determined in *Palermo* that "only three elements must be met: (1) the party has obtained a building permit; (2) has begun construction; and (3) has become liable for work and materials." Mr. Champagne contends that because he met all three elements and did so "in good faith reliance on the permits," he had a "vested right" to continue his operations.

The larger context of *Palermo*, however, does not support Mr. Champagne's conclusion. Instead, *Palermo* concerned a landowner's assertion that Calcasieu

Parish was arbitrary and capricious in rezoning property that prevented further expansion of a landfill, and that the Parish was equitably estopped from enforcing its rezoning action due to the plaintiff's reliance on representations from Parish officials. The supreme court rejected both assertions. With regard to the estoppel claim, the court found that the plaintiff did not prove justifiable reliance on representations of Parish officials, explaining that "Plaintiffs' familiarity … with the changeability of zoning classifications, belies any assertion of justifiable reliance on assumed or implied vested rights." *Id.* at 487 n. 4. That factual distinction is important when one refers to the larger *Palermo* footnote referenced by Mr. Champagne, wherein the supreme court explained:

> The only zoning cases in which vested rights are properly an issue are those in which the opponent of the ordinance has obtained a building permit, has begun construction, and has become liable for work and materials. *Dunn v. Parish of Jefferson,* 256 So.2d 664, 667 (La.App. 4 Cir.), *writ denied*, 260 La. 1137, 258 So.2d 382 (1972). Presumably, it would be possible for a zoning authority to "grandfather in" certain properties when passing a new zoning ordinance, but such a measure is certainly not necessary. Plaintiffs' familiarity … with the changeability of zoning classifications, belies any assertion of justifiable reliance on assumed or implied vested rights. Furthermore, any reliance by Palermo and Nelson cannot be considered detrimental, since neither has expended funds toward the landfill expansion project.

*Id.* In contrast, Mr. Champagne does not allege there was a post-permitting change to the St. Martin Zoning **Ordinance**. He instead asserts a vested right in the erroneously issued **building permits** that without question contravene the existing Parish ordinance. Again, Mr. Champagne applied for a variance and was denied, from which denial no appeal was taken.

Additionally, reference to *Dunn*, 256 So.2d 664, indicates that the fourth circuit in that case addressed an attempt to revoke a permit in an instance where the court specifically found that "there was no error in fact or law, nor any

17

misrepresentation by the applicant which induced the issuance of the permit[.]" *Id.* at 667. Again, the subject building permits in this case were erroneously issued and were not lawfully issued since LDWF had been granted statutory authority over operations at Lake Martin. The Parish had no legal authority to issue building permits within the boundaries of Lake Martin.[14]

That distinction is apparent by reference to *St. Raymond*, 769 So.2d 562 as well. In *St. Raymond*, the fourth circuit concluded that the City of New Orleans acted arbitrarily in attempting to revoke a developer's building permit after he detrimentally relied on the permit to substantially complete the construction of a dwelling. The fourth circuit explained that when a builder relies upon **a lawfully issued permit**, has actually commenced work, and liabilities have been "incurred for work and materials, the owner acquires **a vest[ed] property right** to the protection of which he is entitled." *Id.* at 565 (quoting *Dunn*, 256 So.2d at 667). Important to the fourth circuit's ruling in *St. Raymond*, however, was its consideration of whether the City acted "arbitrarily" in revoking what it foundationally deemed **to be a valid building permit** in which it had "never documented any defect in the permit itself." *Id.* at 566.

The same cannot be said in this case as the permit was very clearly issued in error given the discrepancy in the address and the construction on the lake side of the levee. **Again, the Parish could not lawfully issue any building permits in this statutorily created public lake.** The Parish's injunction suit to address its error and enforce its zoning ordinance cannot be said to be arbitrary, especially considering its obligation to enforce the Public Trust Doctrine, discussed more fully infra.

_____

[14] *See* 1950 La. Acts No. 337; La.R.S. 36:610; La.R.S. 56:801; La.R.S. 56:802.

*Cuccia*, 966 So.2d 611, is similarly distinguishable, both on its facts and on the procedure under review. In that case, the fifth circuit addressed a situation in which Jefferson Parish's Department of Inspections and Code Enforcement (DICE) issued **a lawful building permit** to the plaintiff following its review of plans and specifications for construction of a two-story garage **on privately owned property**. However, on closer inspection during construction, it was shown that a portion of the proposed construction exceeded the height provided for by the pertinent parish building code. As the project neared completion, DICE suspended the permit, asking the plaintiff to either submit new plans or file for a variance. It did not issue a stop work order, however. The homeowner's request for a variance proceeded before the Jefferson Parish Board of Zoning Adjustments, but the homeowner continued work at the site. The Board ultimately denied the variance. It was that denial that was at issue before the court in *Cuccia* not, as in the present case, an action by the Parish attempting to interpret and enforce its own ordinance in furtherance of its Public Trust responsibilities. Most importantly, the lawful building permit in *Cuccia* was issued for work on a private residence on private property, not on a public lake.

This case is also factually distinguishable from *Cuccia* as the plaintiff's "good faith" in his reliance on DICE's representation appears to have been beyond question. Although Mr. Champagne obviously relied on the subject permits, the "good faith" aspect of the case is far from clear at this juncture. The Parish noted that Mr. Champagne provided the wrong address to the Parish permit department at the time he obtained his initial permit, citing the 911 Commission's reference to the property as 1076 Rookery Road. That location is on the land side of Rookery Road. Mr. Champagne constructed all of his buildings on the Lake side of the road/levee,

an area designated as Lake Martin itself. Such a significant error on Mr. Champagne's part would seem to undermine his suggestion that he relied on the permits "in good faith," especially considering his fourteen (14) year experience providing guide services in Lake Martin. All of his construction was not at the address listed on the permits, but on the Lake side of the levee wholly within the confines of Lake Martin and the statutorily created fish, game, and nature preserve and in clear violation of the Parish zoning ordinance.

Like *Cuccia*, Mr. Champagne did seek a zoning variance from the St. Martin Parish Council. After a public hearing at which numerous neighboring property owners and interested parties voiced strong opposition to Mr. Champagne's request, citing by email, letters, and testimony numerous instances of Mr. Champagne's conduct impairing the peaceful utilization of the lake for purposes for which it was intended. The Parish council **denied the variance**. Unlike *Cuccia*, Mr. Champagne did not appeal their decision. Instead, he continued to operate his commercial business activities on Lake Martin, prompting this litigation.

None of the cases cited by Mr. Champagne, or addressed by the majority, involved a zoning complaint in a protected statutorily created nature, fish and game preserve. Simply stated, one cannot acquire a "vested right" to operate a commercial business in a statutorily created fish, game and nature preserve managed by LDWF.

The Parish cites in support of its position two cases that I would suggest are especially applicable to the case at hand. In *Nassau Realty Co. Inc. v. City of New Orleans*, 221 So.2d 327 (La.App. 4 Cir 1969), the plaintiff permit holder sought a reversal of the denial by the zoning board of his application for a variance. The plaintiff was given a permit to begin a residential construction, which was canceled by the city two weeks later **due to insufficient lot area**. The plaintiff sought a

20

variance which was denied. Our sister circuit found that the **hardship was the fault of the plaintiff** who was "thoroughly acquainted with the zoning regulations of that particular locality[,]" for his failure to obtain a **variance prior to the purchase of the property**. *Nassau*, 221 So.2d at 330 (emphasis added).

The same reasoning was evidenced in the case of *Pailet v. City of New Orleans, Dep't of Safety & Permits*, 433 So.2d 1091 (La.App. 4 Cir.), *writ denied*, 440 So.2d 757 (La.1983). In *Pailet*, the city's stop work order was upheld after ten months of construction, and the appellate court determined that the plaintiffs had not acquired a vested right in an **erroneously issued building permit**. The court found the plaintiff's reliance on the building permit was unjustified because plaintiffs were on notice that the property's nonconforming status was questionable. In this case, the public nature of Lake Martin was readily apparent, especially to Mr. Champagne who had operated his crawfish skiff guiding customers on Lake Martin for fourteen (14) years prior to obtaining his "permits" to expand his business on Lake Martin.

Shortly before trial, Mr. Champagne filed an amended answer and reconventional demand claiming that the St. Martin Zoning Ordinance in question was unconstitutionally vague. He repeated his "vested rights" defense, and, in the alternative, claimed damages because of his alleged detrimental reliance on the building permits he had been issued. By joint motion of the parties, approved by the trial court, the Amended Answer and Reconventional Demand was severed from the trial and the issues of the constitutionality of the Parish zoning ordinance and Mr. Champagne's claim for damages are not presently before us. It should also be noted that the Louisiana Attorney General was not notified of the constitutionality issue pertaining to the zoning ordinance raised in Mr. Champagne's Amended Answer

21

and Reconventional Demand.  On remand, the Attorney General must be properly cited and notified.  *See* La.Code Civ.P. art. 1880.

## THE PUBLIC TRUST DOCTRINE

When this case did eventually proceed to trial after the severance of the Amended Answer and Reconventional Demand, now Parish President Cedars stressed in his testimony the important difference between this case and other "zoning injunction" cases, and that is the application of the Public Trust Doctrine.

Mr. Cedars testified that the Parish had a public trust responsibility pursuant to Article 9, Section 1 of the 1974 Constitution, which states:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.[15]

The Louisiana Supreme Court, in *Save Ourselves, Inc. v. La. Envtl. Control Comm'n*, 452 So.2d 1152, 1154 (La.1984) (footnotes omitted), stated with respect to the Public Trust Doctrine:

> It is the well settled law of this country that a state holds title to land under navigable waters within its limits and that the title is held in trust for the people of the state that they may enjoy and use the waters free from obstruction or interference. *Illinois Central R. Co. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892*)*. A public trust for the protection, conservation and replenishment of all natural resources of the state was recognized by art. VI § 1 of the 1921 Louisiana Constitution. The public trust doctrine was continued by the 1974 Louisiana Constitution, which specifically lists air and water as natural resources, commands protection, conservation and replenishment of them insofar as possible and consistent with health, safety and welfare of the people, and mandates the legislature to enact laws to implement this policy. La. Const. art. IX § 1; Cf. *Id*. art. IX §

_____

[15] For a historical discussion of the Public Trust Doctrine, *see* John Arnold & Andrew Jacoby, *Examining the Public Trust Doctrine's Role in Conserving Natural Resources in Louisiana's Public Lands*, 29 Tul. Envtl. L.J. 149 (2017).

3; *Gulf Oil Corp. v. State Mineral Board*, 317 So.2d 576, 580 (1975) (on rehearing).

In a recent opinion, a panel of our court applied the Public Trust Doctrine and stated:

> While there is no specific definition of the public trust doctrine in Louisiana law, "[e]lements of the doctrine are scattered throughout the Louisiana Civil Code, the Revised Statutes, the Louisiana Constitution of 1974, and several Louisiana judicial decisions. No single Louisiana law clearly defines the public trust doctrine and delineates its elements." Wilkins, James G., and Wascome, Michael, "The Public Trust Doctrine in Louisiana," 52 La.Law.Rev 861, 862 (1992). However, a national study of the doctrine by the Coastal States Organization defined the public trust doctrine as follows:
>
> > The Public Trust Doctrine provides that *public trust lands, waters and living resources* in a State are held by the State in trust for the benefit of all of the people, and establishes the right of the public to fully enjoy public trust lands, waters and living resources for a wide variety of recognized public uses. The Public Trust Doctrine is applicable whenever navigable waters or the lands beneath are altered, developed, conveyed, or otherwise managed or preserved. It *applies whether the trust lands are publicly or privately owned*. The doctrine articulates not only the public rights in these lands and waters. It also sets limitations on the States, the public, and private owners, as well as establishing duties and responsibilities of the States when managing these public trust assets. The Public Trust Doctrine has been recognized and affirmed by the United States Supreme Court, the lower federal courts and State courts from the beginning days of this country to the present.
>
> Coastal States Organization, PUTTING THE PUBLIC TRUST DOCTRINE TO WORK, at 3-4 (1990) (emphasis added).

*State v. La. Land & Exploration Co.*, 19-248, p. 16 (La.App. 3 Cir. 5/6/20), _ So.3d _, _ (2020 WL 2187767).

Exercising its Public Trust responsibilities under Article 9, § 1 of the State Constitution, the Parish used its power to enforce its zoning ordinances as a conduit to enforce Act 337 of 1950, as continued through La.R.S. 36:610 and La.R.S.

56:801, and have Mr. Champagne cease his commercial activities and remove his structures from the lake. *See* La.Const. art. 6, § 17; La.R.S. 33:4721; La.R.S. 33:4728. The Parish later withdrew its request to have Mr. Champagne remove all of his structures as LDWF and/or the U.S. Army Corps of Engineers would be the proper parties to make that demand.

As to the "vested rights" issue advanced by Mr. Champagne, when asked about the Parish's error in granting Mr. Champagne **building permits** to construct his buildings and other structures on the Lake, Mr. Cedars testified at trial that:

Q. When you became involved as parish attorney in the matter that resulted in this litigation, were you ever able to determine whether the permit was issued, the initial permits, for the construction were issued in error?

A. Yes, they were. No question in my mind of that.

Q. What was the error?

A. He shouldn't have been given a permit to do any kind of construction work, certainly on the lake side of the road, one; secondly, to conduct no commercial type activity. That wasn't the proper zone to accommodate that, period. Plus there's Article 9, Section 1 issues at play relative to any activity on the lake side of Rookery Road, according to my research.

Q. Are you referring to Constitution Article 9, Section 1?

A. Yes.

Q. What does that provision provide?

A. Well, generally - - again, I haven't read it in a while, but generally it says that parish officials, local government, government, period, local and state needs to adopt all steps to protect the environment and to protect the character of facilities and habitats like Lake Martin which is a natural preserve. **Not only is it a natural preserve, it's a legislatively declared preserve by the Louisiana state legislature.**

Q. What is your conclusion after reading the ordinance - - what does the ordinance provide as to the zoning for the area where Mr. Champagne's structures are?

24

A.   A strict reading of the ordinance would reflect that it's W-2, at best.  I personally have an opinion that the proper zoning would be W-1, as far as property on the lake side.  But for purposes of litigation, for purposes of addressing this matter, I adopted this course of action that would give Mr. Champagne every benefit of the doubt.  So I felt, okay, let's proceed with the litigation. And by the way, as an aside, I prepared the original suit.  Let's proceed with it being a W-2.  A debate as to whether it's W-1 or W-2 is really superfluous, because under neither zoning classification can any commercial activity be conducted.

(Emphasis added.)

On cross examination, counsel for Mr. Champagne inquired about the difference in construction on either side of Rookery Road, following which Mr. Cedars returned to the Parish's Public Trust responsibilities as follows:

Q.   You mentioned that a couple of times, but it's St. Martin Parish Government's position that the entire road, either road, is zoned W-2 and wouldn't allow commercial operations.  Is that correct?

A.   For purposes of this litigation and for purposes of the petition that was prepared in this case, that was the position that was taken, yes.  My personal opinion is a little bit different, quite frankly.

Q.   Whether it's 1076 or 1075, St. Martin Parish Government's position, and I believe your position, too, is that a commercial establishment would not be allowed?

A.   It might be completely different and it does get into a different more complex area when you talk about developments on the lake side of Rookery Road, because that invites, directly, the provisions of Article 9, Section 1 of the Louisiana constitution. Let me tell you something.  **That is one of the - - Lake Martin area is one of the most important habitats, in my opinion, in St. Martin parish, equal to the Atchafalaya Basin, quite frankly.  It serves so many different functions and invites and attracts so many different people that great care should be taken by the administration of St. Martin Parish Government to protect the nature of that preserve.  It is a legislatively declared preserve. And any activity, particularly as it affects the lake side of Rookery Road, ought to be very carefully scrutinized and every single effort should be make [sic] to protect the integrity of that lake.  And your client has done anything but that, despite those permits ….**

25

. . . .

Q. My question was, I'm talking about the local zoning ordinances. Does it matter, for the local zoning ordinances, if he was at 1076 or 1075?

A. **Yes. In my opinion, it would, for the reasons I've stated. Because I believe that when you apply the zoning ordinance in its totality, you cannot turn your nose up and you cannot ignore the dictates of Article 9, Section 1 of the Louisiana constitution that in the interpretation and application of the zoning ordinance of this parish you should take into consideration the activities of a preserve, and that is a preserve. That is a body of water and the high water mark of that body of water is indeed - - let me use your, is indeed Rookery Road itself.** And if you want to go to [Zoning Ordinance] Article 3, you might need to look at Section 4, regulation of Areas under Water, Page 16. **"All areas which are under water and not shown as included within any district shall be subject to all of the regulations of woodland/flood zone areas." I believe when you apply the ordinance in its totality, when you implement and insert and infuse in that Article 9, Section 1, you necessarily have to give that zoning classification for the lake side of Rookery Road the most stringent restricted application possible, period** ….

(Emphasis added.)

And, finally, on redirect examination, Mr. Cedars again replied as follows:

Q. Mr. Cedars, did I correctly understand your testimony in response to one of Mr. Adley's questions that it is the position of St. Martin Parish Government that as a result of Article 9, Section 1 of the Louisiana constitution St. Martin Parish Government has [an] affirmative and mandatory duty with regard to the enforcement of zoning in a wildlife preserve area that does not exist with regard to commercial and residential areas? Did I interpret you correctly?

A. I think so, yeah.

Q. Were you ever able to establish how the error occurred for the issuance of the permits?

A. I think the permit from my discourse [with] members of my office and based upon my discourse back in 2016 when I began to examine this matter on behalf of the St. Martin Parish Government, I think there was a misapplication of the zoning

ordinance, whether its 1075 or 1076 Rookery Road that you're dealing with. I think there's not any question that the permit was improperly and inappropriately issued, period, and people make mistakes.

Q.    A mistake on the part of the government; is that correct?

A.    That's correct. I think it was an administrative error. I get what the arguments of the defendant is in this case. I understand all that. I embrace all that. But I think that at the end of the day, especially since I'm looking at this with a different set of eyes from a different perspective now that I'm Parish President, **when you look at all of this, you have to do what I think Article 9, Section 1 dictates, is that we adopt any and all steps as vigilantly as we possibl[y] can to protect the nature and character of that preserve. It's very important not only environmentally but to the whole community.** So you put all that together and despite the fact an error may have been made, although I don't think it was made for 1075 Rookery Road, if an error was made for 1076 or if you want to give 1075 a W-2 classification, **you can't change a legislative act by an administrative error, period** . . . .

(Emphasis added.)

In his testimony, Mr. Cedars stressed that the lake side of "Rookery Road," previously "Levee Road" built on a portion of the levee surrounding Lake Martin pursuant to Act 337, should have been zoned W-1, wetlands, an even more restrictive zoning. However using either the Parish's W-1 or W-2 zoning ordinance, it is uncontradicted that commercial activities such as being conducted by Mr. Champagne and his businesses are not allowed on the lake side of Rookery Road, especially when you also consider Article 3, Section 4 of the Zoning Ordinance[16] and Article 9, Section 1 of the Constitution of 1974, the "Public Trust Doctrine."

_____

[16] Titled "Regulation of areas under water," Article 3, Section 4 provides: "All areas which are under water and not shown as included within any district, shall be subject to all of the regulations of Woodland/Flood Zone areas." Reference to the Ordinance regulations for the pertinent Woodland/Flood Zone areas, W-1 and W-2, indicates that the type of permanent, commercial buildings constructed by Mr. Champagne are not "permitted uses" therein.

Simply stated, an "administrative error" by a Parish official cannot change the nature of a statutorily created lake that is constitutionally protected under the Public Trust Doctrine. I would reverse and issue the permanent injunction.

Mr. Champagne may have a remedy for damages as alleged in his severed Reconventional Demand.[17] Mr. Champagne may also have a right on remand to re-urge his position that the St. Martin zoning ordinance is unconstitutional, since that issue was also severed and was not properly before the trial court. Again, if Mr. Champagne wishes to make that argument, the Attorney General must be notified of the alleged constitutional challenge pursuant to La.Code Civ.P. art. 1880.

_____

[17] The "Motion and Order to Sever Claims for Trial," signed by the trial court on April 1, 2016 provides:

> ON JOINT MOTION of Plaintiff, St. Martin Parish Government, and Defendants, Bryan Champagne, et al., through their undersigned counsel, and on suggesting to the Court that Defendants have filed a Reconventional Demand seeking certain monetary damages from Plaintiff if Plaintiff is successful in its claims against Defendants in this litigation, and further, the trial of such Reconventional Demand will be lengthy, complex, and possibly involve the testimony of expert witnesses, all of which will be moot and unnecessary if Plaintiff fails to prevail on its claims, and therefore Plaintiff and Defendants desire to sever the Reconventional Demand from the claims in Plaintiff's original Petition for the purposes of trial on the merits.

> IT IS ORDERED, ADJUDGED AND DECREED that the claims of Defendants filed by Reconventional Demand in these proceedings be and the same are severed for trial on the merits from the Plaintiff's claims currently set for trial on the merits for April 8, 2019.

**NON-JOINDER OF NECESSARY AND INDISPENSABLE PARTIES**

On remand, I would hold that additional parties should be added pursuant to a Rule to Show Cause set by the trial court for that purpose.  Although no exception of non-joinder was filed in the district court, the trial court may take cognizance of the lack of indispensable and necessary parties pursuant to La.Code Civ.P. arts. 927, 641 and 645.

Louisiana Code of Civil Procedure Article 927 provides in pertinent part:

A. The objections which may be raised through the peremptory exception include but are not limited to the following:

. . . .

(4) Nonjoinder of a party under Articles 641 and 642.

. . . .

B. The court may not supply the objection of prescription, which shall be specially pleaded. The nonjoinder of a party … may be noticed by either the trial or appellate court on its own motion.

Further, Louisiana Code of Civil Procedure Article 641 states:

A person shall be joined as a party in the action when either:

(1) In his absence complete relief cannot be accorded among those already parties.

(2) *He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either*:

(a) *As a practical matter, impair or impede his ability to protect that interest*.

(b) *Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations*.

(Emphasis added.)

Louisiana Code of Civil Procedure Article 645 also states, "The failure to join a party to an action may be pleaded in the peremptory exception, or may be noticed by the trial or appellate court on its own motion."

Two cases from this circuit explain the consequences of failing to join an indispensable party. The first is *Nicholas v Richardson*, 573 So.2d 1317, 1318 (La.App. 3 Cir. 1991), which stated:

> The failure to join an indispensable party to an action may be noticed by a[n] appellate court on its own motion. LSA–C.C.P. arts. 645, 927. When an appellate court notices the absence of indispensable parties to a suit on appeal, the appropriate remedy is to set aside the judgment and remand the matter for joinder of the absent parties and retrial. *Horn v. Skelly Oil Co.*, 221 La. 626, 60 So.2d 65 (1952); *Edmonson v. Abell*, 423 So.2d 100 (La.App. 1st Cir.1982).

In the more recent case of *Suire v. Oleum Operating Co.*, 17-117, p. 17 (La.App. 3 Cir. 11/2/17), 235 So.3d 1215, 1228-29, *writ denied*, 18-271 (La. 4/6/18), 240 So.3d 184, *writ denied*, 18-279 (La. 4/6/18), 239 So.3d 827, this court cited *Nicholas* in agreeing that remand was required:

> In Louisiana, the failure to join an indispensable party to an action may be noticed by an appellate court on its own motion. La.Code Civ.P. arts. 645, 927. "When an appellate court notices the absence of indispensable parties to a suit on appeal, the appropriate remedy is to set aside the judgment and remand the matter for joinder of the absent parties and retrial." *Nicholas v. Richardson*, 573 So.2d 1317, 1318 (La.App. 3 Cir. 1991).

In another recent case, *Jamestown Forestland, LLC v. Setliff*, 17-637 (La.App. 3 Cir. 12/28/17), 235 So.3d 1183, this court found that the trial court erred in discussing the defendant's argument based on acquisitive prescription and then granting an exception of res judicata without joining the owner of the immovable property, a necessary and indispensable party to the lawsuit. The court cited La.Code Civ.P. art. 641, specifically Paragraph (2), which applies to the case at hand, and provides in relevant part:

A person *shall* be added as a party in the action when either:

. . . .

(2) *He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either*:

(a) *As a practical matter, impair or impede his ability to protect that interest.*

(b) *Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations.*

(Emphasis added.)

The panel in *Jamestown*, 235 So.3d at 1186, further noted:

"It is well settled that the lack of an indispensable party to a proceeding in the trial court is fatal to any adjudication of the dispute." *Shamieh v. Liquid Transp. Corp.*, 07-1282, p. 6 (La. App. 3 Cir. 1/30/08), 975 So.2d 161, 164 (citations omitted). Further, "[a] party shall be deemed necessary for just adjudication when that party's presence is absolutely necessary to protect its substantial rights." *Id.* at 165 (citation omitted). As stated in *Stephenson v. Nations Credit Fin. Servs. Corp.*, 98–1688, 98-1689, p. 10 (La.App. 1 Cir. 9/24/99), 754 So.2d 1011, 1019, "an adjudication made without making a person described in Article 641 a party to the litigation is an absolute nullity."

Considering the statutes and cases cited, it is appropriate that for the foregoing reasons the Louisiana Department of Wildlife and Fisheries (LDWF), the Louisiana Department of Natural Resources (LDNR), the Nature Conservancy, and the U.S. Army Corps of Engineers may be indispensable parties to a just and proper resolution of this litigation. Consideration of whether these entities must be joined as indispensable parties remains for the trial court's determination by contradictory hearing set for that purpose. *See* La.Code Civ.P. art. 641; La.Code Civ.P. art. 645. These entities may also be allowed to join as intervenors or submit amicus briefs if allowed to do so.

**ANCILLARY MATTERS**

As for the remaining pleadings filed by Mr. Champagne with this Court on appeal, I concur with the majority's decision to deny Mr. Champagne's motions to dismiss and his exception of no right of action.

**CONCLUSION**

Mr. Bryan Champagne had no legal authority to construct commercial buildings from which he conducts commercial activities on Lake Martin, a statutorily created fish, game and nature preserve. *See* 1950 La. Acts No. 337.

The Parish properly exercised its Constitutional duty under the Public Trust Doctrine to utilize its zoning ordinance and to seek to enjoin Mr. Champagne from operating his commercial activities from buildings and structures he constructed on Lake Martin, unquestionably in violation of the Parish zoning ordinances and wholly within the boundaries of this protected, legislatively created State preserve. While the Parish did erroneously issue building permits from the executive branch of the Parish for Mr. Champagne to build commercial structures on the Lake, those permits were issued through an administrative error, could not be lawfully issued in the preserve, and cannot act to estop the Parish from enforcing its zoning ordinance pursuant to its Public Trust responsibilities. Mr. Champagne did seek a variance from the legislative body of St. Martin Parish to allow him to operate on the Lake side of the Parish road in question, "Rookery Road," but it was denied. He did not appeal that ruling.

I would reverse the trial judge and issue the injunction requested by the Parish. Mr. Champagne's reconventional demand to have the Parish zoning ordinance declared unconstitutional and his alternative claim for damages was severed and should be remanded for decision by the trial court. I would order that potential

necessary and indispensable parties be notified and a hearing set by the trial court to determine whether the LDWF, LDNR, U.S. Army Corps of Engineers, the Nature Conservancy and/or other interested parties should be added or allowed to intervene and/or submit amicus briefs. I would assess costs of this appeal and the costs associated with the injunction in the trial court to Bryan Champagne, individually and as corporate representative for The Wharf on Lake Martin, LLC and Champagne's Cajun Swamp Tours, LLC.